TIMOTHY H. PORTER *vs.* THOMAS G. RITCH ET AL.

70 235
72 94
72 95

Third Judicial District, Bridgeport, Oct. Term, 1897. ANDREWS, C. J.,
TORRANCE, BALDWIN, HAMERSLEY and HALL, Js.

Chapter 162 of the Public Acts of 1889 relating to the commitment of
insane persons, provided (§ 6) that "pending proceedings" for the
hearing and examination, the judge of probate might make and
enforce such reasonable orders for the care and custody of the per-
son alleged to be insane, as he should deem suitable and proper.
*Held:—*

1. That this provision for the temporary detention and restraint of the
individual alleged to be insane, was not an infringment of the con-
stitutional right of personal liberty, but a justifiable regulation of
that right in the interest of society.
2. That the "proceeding" mentioned in the statute was not an ordi-
nary "action" at law, which would be pending only from the ser-
vice of process upon the adverse party, but an inquest of insanity,
a police regulation; and therefore was "pending" as soon as the
complaint had been referred to the judge.
3. That an order for the temporary detention of the person alleged to
be insane, pending a hearing upon the complaint, was merely a part
of the procedure and not an adjudication which entered into the
judgment or decree.

If the plaintiff intends to prove that the acts charged against the de-
fendant were committed by his agent, the complaint should aver
the agency, otherwise the evidence will be excluded on objection.

A statement by a witness that the members of a literary club considered
a paper read by the plaintiff as one of the strongest they had had,
is hearsay and irrelevant upon the question of the plaintiff's sanity.

Where the defendant's action is claimed to have been malicious, he may
show that he acted upon the advice of counsel in all that he did.

It is within the discretion of the trial court to exclude a hypothetical
question, until a foundation for it has been laid by the evidence.

The trial court found that a certain written agreement set forth at
length by the defendants in their answer as a release and discharge
of the cause of action alleged by the plaintiff, was intended by all
the parties to accomplish and did effect a full and final settlement
of all claims, questions and differences between them, as averred
by the defendants; and that said agreement was not executed by
the plaintiff under duress, as averred by him in his reply, but vol-
untarily and under the advice of his friends and counsel. *Held* that
this finding constituted an absolute bar to the plaintiff's entire
action; and that if the plaintiff had desired to raise the claim that
the written agreement did not by its terms operate to bar his action,

and that the intent of the parties that it should have that effect was unavailing because not so expressed in it, he should have demurred.

[Argued November 5th, 1897—decided January 5th, 1898.]

ACTION to recover damages for the unlawful detention and restraint of the plaintiff, brought to the Superior Court in Fairfield County and tried to the court, *Prentice, J. ;* facts found and judgment rendered for the defendants, and appeal by the plaintiff for alleged errors in the ruling of the court. *No error.*

The complaint in this action is in three counts. The gist of the whole action is that the defendants conspired together to obtain from the plaintiff a very large sum of money, and that in pursuance of such conspiracy they made a false and malicious complaint to the judge of probate in the district of Stamford, in which district the plaintiff resided, therein representing that the plaintiff was insane and unfit to go at large, and obtained from the said judge an order that the plaintiff be committed to the custody of two of the defendants ; that by reason of the said order they arrested the plaintiff and kept him in imprisonment for three months and until they had extorted from him more than $100,000 ; and that by reason of said imprisonment the plaintiff was greatly injured in his health. All the acts for which relief is sought in the complaint, were done in the procuring or execution of the said order and the conspiracy in pursuance of which it is alleged such acts were committed.

The answer contains four defenses, either one of which, if sustained, would defeat the plaintiff's action. They are the general issue, a plea in bar which sets up a lawful order of the Court of Probate in obedience to which all the acts were done, a former judgment, and a discharge. Summarizing all the facts of the answer and putting them into one connected story, it is this :—

On the 18th day of December, 1893, Schuyler Merritt, one of the defendants, acting in good faith and fully believing that the plaintiff was an insane person, and that the safety of himself and of others required that the plaintiff should be

placed under restraint or in the care and custody of some suitable person, made an application to the Court of Probate in the district of Stamford, as follows, as appears by the records of said court: "In the matter of the complaint of Schuyler Merritt, for a hearing regarding the alleged insanity of Timothy H. Porter.

"To the Hon. H. Stanley Finch, a judge of Probate within and for the Probate District of Stamford, in the County of Fairfield and State of Connecticut:

"The complaint of Schuyler Merritt, of said town of Stamford, in said County and State, respectfully shows: That Timothy H. Porter, now and for many years last past a resident of said Stamford, is now and has for a long time past been insane, and is a fit subject to be confined in an asylum. Wherefore your complainant prays your Honor to inquire into the alleged insanity of the said Timothy H. Porter, and whether he is a fit subject to be confined in an asylum.

"Dated at Stamford, this 18th day of December, 1893.
                              "SCHUYLER MERRITT."

The Court of Probate thereupon made an order that a hearing be had on said application at the probate office on the 26th day of December, 1893, at ten o'clock in the forenoon, and that notice of the time and place of hearing, together with a copy of said application, be served on the said Timothy H. Porter, on or before the 19th day of December, 1893. The said Schuyler Merritt at the same time presented to the said Court of Probate the affidavit of Dr. Henry P. Geib, as follows: "In the matter of the complaint of Schuyler Merritt as to the alleged insanity of Timothy H. Porter. I hereby certify that on the 14th and 15th days of December, 1893, I made a personal examination of Timothy H. Porter of said Stamford, and from my knowledge of his case, having been his physician for a long time, and from the facts that have come to my knowledge regarding his condition, I am of the opinion that he is insane, and that he is unfit to go at large, and is a fit subject for confinement in an asylum or other suitable place of detention; for in my judgment he is suffering from post paralytic dementia, and his disease is at that stage where

he might at any time be seized with homicidal mania, thereby
endangering the lives of those with whom he might be thrown
in contact, as well as his own.   Dated at Stamford, this 18th
day of December, 1893.   Henry P. Geib." This affidavit
was sworn to before competent authority, and the court is-
sued an order, as follows : " In the matter of the complaint
of Schuyler Merritt regarding Timothy H. Porter, a supposed
lunatic.   It is hereby ordered that pending the proceedings
for a hearing and an examination on the foregoing complaint,
the care and custody of the said Timothy H. Porter is hereby
committed to Richard Bolster and Henry E. Schock, judi-
cious and proper persons for that purpose, who shall confine
the said Timothy H. Porter under suitable and proper re-
straint in his home in said Stamford, until said hearing and
until further order is made.   Dated at Stamford, this 18th
day of December, 1893.   H. Stanley Finch, Judge of the
Court of Probate for the district of Stamford."

In company with a proper officer, and with these papers, the
said Bolster and Schock on said day went to the house of the
plaintiff.   The officer served the said order of notice, and
thereafter Bolster and Schock made known to the plaintiff the
order by which the care and custody of his person was com-
mitted to them.   Acting on that order and in the belief that
it was a lawful one, and that the plaintiff was an insane per-
son, they remained during the time named in the complaint
in the home of the plaintiff, keeping him under suitable and
proper restraint, and kept such watch of his movements as
was necessary to prevent him from destroying property or
doing injury to himself or others.   But at no time did they
or either of them assault him, or use any force upon his per-
son, or offer him any indignity or incivility.

On the 19th day of December, 1893, the plaintiff prayed
out from the Superior Court in Fairfield county a writ of
*habeas corpus* against the present defendants, Merritt, Bol-
ster, Schock, and Louis H. Porter, a son of the plaintiff.
This writ required the said persons to appear before the said
Superior Court on the 21st day of December, 1893.   At that
time all the respondents named in said writ appeared before

the Superior Court. The said Merritt and Louis H. Porter made return denying all the allegations of the plaintiff's application, so far as they were charged. The said Bolster and Schock made return setting out all the said proceedings of the said Court of Probate, and assigned the same as the cause of their detention and imprisonment of the plaintiff. To this latter return the plaintiff made reply denying the jurisdiction of the Court of Probate to make the order, and alleging that the order was void on its face, that it was made without hearing, was unreasonable, etc., etc. To this reply the said Bolster and Schock demurred. The Superior Court found the issue for the said Merritt and Porter, that they had "not in any manner detained or restrained said complainant (the plaintiff) or deprived him of his liberty;" and also sustained the demurrer filed by said Bolster and Schock to the reply of the plaintiff to their return, and upon the issue formed by said demurrer found that the said judge of the Court of Probate had jurisdiction of the proceedings set forth in the said return of said Bolster and Schock, and possessed the power under the statute law of the State to make the order set forth therein, placing the plaintiff in the care and custody of the said Bolster and Schock, pending the proceedings for a hearing and examination, as therein mentioned, and that said order was reasonable; and remanded the prisoner to the care and custody of the said Bolster and Schock to be held by them under the said order. From the judgment on this latter issue an appeal was taken by the plaintiff to the Supreme Court of Errors. But no appeal was taken from the judgment on the issue made by the return of the said Merritt and Porter.

On the same day, i. e., the 19th day of December, 1893, an application was made to the Court of Probate in the district of Stamford, by Louis H. Porter, Blachley H. Porter and Arthur K. Porter, minor sons of the plaintiff, by their next friend Schuyler Merritt, praying for the appointment of a conservator over said plaintiff, on the ground that he was mentally unsound and incapable of managing his affairs; which application was duly served and returned, and the

said Court of Probate ordered the same to be heard before the court on the 3d day of January, 1894.

By reason of the said *habeas corpus* proceedings in the Superior Court and the appeal to the Supreme Court, the several matters and applications in the Court of Probate were continued from time to time until they were all finally terminated as is hereafter stated.

On the 21st day of December, 1893, the plaintiff brought a complaint in the the Superior Court in Fairfield county against the said Merritt, Bolster, Schock and Louis H. Porter, praying that they and each of them be enjoined from interfering with his books and papers, and for other relief; upon which a temporary injunction was issued by a judge of the Superior Court, which, with the said complaint, was served on the persons therein named as defendants.  On the 2d day of January, 1894, Schuyler Merritt and Thomas G. Ritch, executors of and trustees under the last will of Louisa H. Porter, the deceased wife of the plaintiff, and Louis H. Porter, Blachley H. Porter and Arthur K. Porter, being persons interested in the said will, brought their complaint to the Superior Court in Fairfield county, alleging that the plaintiff was wasting and conveying away the property of the said estate, and demanding $250,000 damages.  The complaint was served and returned to the said Superior Court.

On the 21st day of February, 1894, while all the said suits, applications, actions and appeals were pending in the said mentioned courts and were all being prosecuted, and while other differences, controversies and disagreements existed between the parties or some of them, the plaintiff, the defendants, and Louis H. Porter and Blachley H. Porter, sons of the plaintiff, who were interested in the said matters, questions, and differences aforesaid, met together with the purpose and intention of making a final and complete settlement, adjustment and end of all the said differences, controversies, suits and claims, and entered into an agreement in writing which was executed and delivered by all of the said parties, and is spoken of as the " family agreement."   The

defendants thereupon performed all the provisions and un-
dertakings on their part to be performed, caused all the said
applications to be withdrawn and discontinued, and aver
that by said agreement and the proceedings thereunder, and
by the performance by the defendants of the provisions and
conditions thereof on their part to be performed, and by said
acts of the defendants, the subject-matter of the present suit
and the plaintiff's claims or alleged right of action described
in his said complaint, and all of the controversies, questions
and claims between the plaintiff and the defendants, were
fully and finally adjusted, settled, satisfied and ended.

The plaintiff, in reply, admitted the making and execution
of the said family agreement, but says he executed it under
duress—the duress of imprisonment mentioned in the com-
plaint. All the issues were found in favor of the defend-
ants, and the plaintiff takes this appeal.

The finding of facts, omitting those paragraphs which
speak only of evidential facts, is as follows : " 13. The de-
fendant Merritt married the only sister of the plaintiff's
said second wife. 14. Said Merritt, with his wife, has for
many years resided near to the plaintiff in Stamford, and
prior to 1893 was on close terms of intimacy and confidence
with the plaintiff and his family. Since this date there has
been an estrangement on the part of the plaintiff, growing
out of conditions and circumstances which have led up to
and culminated in the present controversies ; while, on the
other hand, and for the same cause, he has been drawn into
even closer relations with the other members of the plaintiff's
family, who have come to rely upon him as their confidant,
adviser and friend. . . . 18. On December 18th, 1893, the
defendant Merritt, after consultation with his attorney, Sam-
uel Fessenden, Esq., and acting upon his advice, signed, and,
through his attorney, filed with the Court of Probate for
the district of Stamford the application appearing in the
copy of the records of said court, hereto annexed, and
therewith the physician's certificate, likewise appearing in
said copy of record, which had been made by Dr. Geib, the
family physician, upon application of Mr. Merritt or his at-

torney for a certificate setting forth his opinion of the plaintiff's mental condition, which he had previously expressed to said Merritt. 19. Said application and affidavit having been filed as aforesaid, said court forthwith issued an order for a hearing thereon, to be held on December 26th, 1893—being the order appearing in said annexed copy of record—and delivered the same to Edward Gorman, a constable of said town, for service ; and immediately thereupon said court, upon the motion of the defendant Merritt's said attorney, and relying upon said affidavit, issued the preliminary order for the custody of the plaintiff, likewise appearing in said annexed copy of record, and delivered it to said Bolster and Schock for service. 20. Said Gorman, Bolster and Schock thereupon proceeded together to the plaintiffs' house. Having been in the ordinary course admitted to the plaintiff's presence, said Gorman made due service of said order for a hearing pursuant to its directions. 21. Said Bolster and Schock thereupon presented the order which they had in their hands, as aforesaid, and read it to the plaintiff, in the hearing of his attorney, James H. Olmstead, Esq., who was present. Upon Mr. Olmstead's request, the order was then handed to and examined by him, who then advised the plaintiff that it was his duty to recognize it. The plaintiff thereupon submitted to the authority of said Bolster and Schock under said order, and they forthwith entered upon their duties as the plaintiff's custodians thereunder. . . . 32. On December 19th, plaintiff's counsel obtained from the Superior Court a writ of *habeas corpus* returnable December 21st. 33. Upon the occasion of the hearing upon said writ, it was agreed between counsel that Mr. Henry Stoddard, one of the plaintiff's then counsel, should take possession of the securities and valuable papers in the plaintiff's house, which was immediately thereafter done. This agreement having been made, the terms and conditions of the judgment entered in said proceedings were consented to by the defendants therein. . . . 36. All the acts of the defendants, Bolster and Schock, during the period of the plaintiff's restraint, as aforesaid, which are the acts complained of, were performed by them

as officers of the law, in the execution and under and within
the authority of said order, in good faith and in a full belief
in the validity of said order, and with an honest desire on
their part to execute it, and in its reasonable execution under
the circumstances, as they appeared to them at the time.
37. None of the acts of said Bolster and Schock aforesaid,
were done by them as the agents of said Merritt and Ritch,
or either of them, unless the law implies such an agency from
the facts herein found. . . . 43. During the period that
said Bolster and Schock remained in charge of the plaintiff
as aforesaid, hearings were from time to time had before the
Court of Probate upon said original application, the plain-
tiff being present, and represented by his counsel, Messrs.
Stoddard and Olmstead. 44. Early in January, and before
the case for the applicant had been concluded, Mr. Stoddard
made to the opposing counsel suggestions of a settlement of
the existing differences and controversies. These sugges-
tions were so urgently pressed by Mr. Stoddard, that it was
agreed between counsel that the hearing should be sus-
pended, pending an effort by Mr. Stoddard to bring about a
settlement. 45. This was done and Mr. Stoddard set about
the difficult task which he had set for himself in opposition
to views of the parties concerned. . . . 47. He persisted,
however, and through the influence which he, with other
friends, brought to bear upon the plaintiff, and his appeals
to Mr. Merritt and his sons, the latter of whom yielded only
with the greatest reluctance, it finally came about that said
family agreement—which was prepared and drafted by Mr.
Stoddard himself, and which contained provisions which, for
the most part, he suggested—was signed and executed. . . .
50. Said family agreement was executed by the plaintiff
freely and voluntarily, and under the advice of his friends
and counsel, and without any influence having been brought
to bear upon him by any person or persons save only his
friends and counsel, who, acting solely in his interest, ad-
vised and urged him to its execution. 51. None of the
defendants, nor any other person acting for them or in their
interests, said any word, or did any act whatsoever. 52. Dur-

ing the negotiations which resulted in the execution of said family agreement, neither of the defendants or their counsel, or any person for or in their behalf, had any interview with the plaintiff, or correspondence with him. All the negotiations leading to said settlement were conducted on his part by his said counsel, Mr. Stoddard, and on the part of the others by Mr. Merritt, said two sons, and their counsel. 53. It was understood, intended and agreed by all the parties to said negotiation and settlement, and to said family agreement, that the same should accomplish a full and final settlement and adjustment of all the existing claims, questions and differences between the parties thereto, and of all legal proceedings then pending, and the subject-matters thereof, and of all matters arising out of the proceedings instituted by the defendant Merritt, as set forth in paragraph 18, in favor of, or against, whatever party, and including all the matters covered by the plaintiff's complaint, all of which antedated said settlement. 54. Upon said March 5th, and immediately upon the delivery of the family agreement, the legal proceedings hereinbefore described, all of which were still pending, were withdrawn, and the restraint exercised over the plaintiff by the presence of the defendants, Bolster and Schock, and their deputies, in the plaintiff's house or otherwise, at once terminated, and the plaintiff was fully restored to his liberty. 55. The defendants, Merritt and Ritch, have performed all the things required of them to be performed by the terms of said agreement. 56. No party to said agreement except the plaintiff, has sought to repudiate it, or done any act to repudiate it. . . . 76. The defendant Ritch in no manner participated in, authorized, instigated or advised the making of said application to the Court of Probate, or the procuring of said preliminary order, or the placing of the defendants, Bolster and Schock, in the plaintiff's premises as aforesaid, or any of the acts described in the complaint. He had no knowledge whatever that said proceedings, or any proceedings of similar character, were contemplated, until after their institution, when he learned of it as a matter of common notoriety. 77. The defendant Merritt did not personally par-

ticipate in the performance of any of the acts done in the execution of said order, or in the restraint or detention of the plaintiff, or give any of the directions thereto relating. 78. All the acts herein recited as done by the defendant Merritt's attorney, were done by said Merritt's authority and with his approval. 79. The defendant Merritt, and he alone, was the party immediately responsible for the bringing of said application, and its prosecution and continuance as hereinbefore set forth. 80. In so bringing, prosecuting and continuing said application, and in obtaining said temporary order of restraint, and in all that he did in the premises, the said Merritt acted in good faith, and in the full and reasonable belief that said proceedings were legal and valid, and that said steps and proceedings were necessary for the protection of the person and property of the plaintiff and his family. 81. During the year 1893 said Merritt was, by the circumstances existing in the plaintiff's family, brought into especially close relations with its members. By them and others he was, during that time, constantly advised of the plaintiff's conduct. This information, upon which he relied, together with the matters which had come within his own observation and knowledge, and the statements of the family physician, led him naturally and reasonably to the conclusion which he honestly entertained, that the plaintiff's mind was unsound, and that he ought, in the interests of himself and his family, to be subjected to restraint in some proper institution. Said Merritt's fears, as the result of this information and observation, were that the plaintiff, by reason of his unsound mental condition, was, as he was advised by the family physician, liable to do violence; that he, as evidenced by the extensive correspondence with women, discovered by his sons, was in danger of contracting an ill-advised marriage; and that he was liable to waste, squander, misuse or jeopardize the properties in his keeping, if he was not already doing so, as was believed."

Upon the trial the plaintiff made the following legal claims: " (a) That chapter 162 of the Public Acts of 1889 is unconstitutional and void, and affords the defendants no legal

justification for their said acts. (b) That said Act, if not unconstitutional in its entirety, is unconstitutional in the provision it makes for the custody of the alleged lunatic pending the proceedings. (c) That said original proceedings were not legally pending until notice thereof had been given to the plaintiff of such pendency. (d) That said order, issued as and when it was, afforded no justification to any of the defendants for the acts claimed to have been done by them under it, because said court was at the time of its issuance without jurisdiction to issue it. (e) That the defendants Merritt and Ritch, having by their attorney fully authorized by them, prayed out said illegal order, are liable to trespass for all that was done under it. (f) That said Bolster and Schock were chargeable with knowledge of its illegality, and therefore not justified by it. (g) That said order, being issued by the said court without any jurisdiction, it could in law afford no justification to any one for any act done or attempted under it, whether such person actually knew of such want of jurisdiction or not. (h) That even if said law was constitutional and valid, and said order legal, the defendants are liable in trespass for the acts done by them to the plaintiff, because said acts were in excess of the authority conferred by said order. (i) That by reason of such excess all the defendants became trespassers *ab initio,* and were liable for all the acts of imprisonment as though no order had been issued. (j) That the facts in the case in law constitute a conspiracy between the defendants Merritt and Ritch and the two elder sons of the plaintiff, to represent him to be insane, for the purpose of depriving him of his liberty to marry, and of managing his property. (k) That the facts in the case establish and constitute in law a conspiracy between said persons to take some measures to restrain the plaintiff, on the ground of his alleged insanity, and that the defendant Ritch, as well as the defendant Merritt, is chargeable in law with all that was in fact done in said insanity proceedings. (l) That the defendants Bolster and Schock, having acted as agents of the other defendants, are jointly liable with them as co-conspirators. (m) That

said contract known as the "family agreement" was void, as obtained by duress. (*n*) That said pretended contract was void as being without consideration. (*o*) That said pretended contract was void as founded upon an illegal consideration. (*p*) That said pretended contract, having as an essential part of its consideration an agreement by a minor, which said minor forthwith repudiated and violated, said contract was therefore void and not binding upon anyone. (*q*) That said pretended contract, having as an essential part of its consideration an agreement by executors and trustees of the estate of Louisa H. Porter to abdicate their trust and turn over for an indefinite time all the trust property to other hands, was therefore illegal and void, and not binding upon anyone. (*r*) That said contract did not release or in any manner constitute a bar to the present cause of action. (*s*) That all the defendants, having joined in a special defense of justification, if said defense upon the facts of the case were bad as to any of the defendants it was bad as to all, and the plaintiff is entitled to judgment against all upon that issue. (*t*) That upon the facts found the plaintiff is entitled to judgment against all defendants. (*u*) That upon the facts disclosed by the plea of *res adjudicata* in the third defense, and the exhibits therein referred to, said defense of *res adjudicata* could not be sustained."

Notwithstanding said claims of the plaintiff the court upon the facts aforesaid, rendered judgment for the defendants.

*Robert E. DeForest* and *Stiles Judson, Jr.*, for the appellant (plaintiff).

The Court of Probate had no jurisdiction to issue the order of custody. *Brooks* v. *Adams*, 12 Pick. 441; *Hall* v. *Howd*, 10 Conn. 519; *Sears* v. *Terry*, 26 id. 285; *Grumon* v. *Raymond*, 1 id. 46. At the time the order of custody was issued, the court had neither jurisdiction of the person, nor of the subject-matter. The court had not jurisdiction of the person, for no proceedings were then *pending*, the summons to answer a "pending" complaint, not having been served upon the plaintiff. *Taylor* v. *Judd*, 41 Conn. 485; *Studwell* v. *Cooke*,

38 id. 551; *Elting Woolen Co.* v. *Williams*, 36 id. 319; *San-ford* v. *Dick*, 17 id. 216; *Spalding* v. *Butt*, 6 id. 29; *Jenks* v. *Phelps*, 4 id. 152. The mere *issuing* of a summons is not the commencement of an action for general purposes. *Kerr* v. *Mount*, 28 N. Y. 664. If the Act in question authorized the preliminary order of custody without notice and without a hearing to the alleged lunatic, it is unconstitutional. With-out this there can be no due process of law. *Stuart* v. *Pal-mer*, 74 N. Y. 191; *Bostwick* v. *Isbell*, 41 Conn. 305; *Bowler* v. *Eldridge*, 18 id. 1; *Chase* v. *Hathaway*, 14 Mass. 222; *May's Case*, 10 Pa. C. C. 283; *Portland* v. *Bangor*, 65 Me. 120; *Underwood* v. *The People*, 32 Mich. 1; *Morton* v. *Sims*, 64 Ga. 298; *Eddy* v. *The People*, 15 Ill. 386; *McCurry* v. *Hooper*, 12 Ala. 823; *Matter of Blewitt*, 131 N. Y. 546; In *Re Van Auker*, 10 N. J. Eq. 186; *Smith* v. *Burlingame*, 4 Mass. (U. S. C. C.) 121. Undoubtedly any person *without warrant* may lawfully hold a lunatic in physical restraint for a reasonable time, in which to permit of judicial proceedings. This is a common law right; but in exercising that right the person restraining a supposed lunatic must justify, by showing that he was in such condition as reasonably de-manded such physical restraint. *Keleher* v. *Putnam*, 60 N. H. 30; *Colby* v. *Jackson*, 12 id. 526; *Look* v. *Choate*, 108 Mass. 116. If the court had no jurisdiction the defendants are trespassers. *Pierce* v. *Thomas*, 11 Conn. 472; *Colt* v. *Evers*, 12 id. 258; *Look* v. *Choate, supra.* The defendants Ritch and Merritt, are liable too, because they proceeded maliciously, in legal contemplation. *Humphrey* v. *Case*, 8 Conn. 102; *Stone* v. *Stevens*, 12 id. 219; *Lockenown* v. *Sides*, 57 Ind. 360; *Ives* v. *Bartholomew*, 9 Conn. 309; *Carathers* v. *McIlhenny Co.*, 63 Tex. 143; *Thompson* v. *Rubber Co.*, 56 Conn. 498. The claim, that the particular mode of proceed-ing was the outcome of *bona fide* consultations with counsel, and for *that* reason, the defendant Merritt is protected from the charge of bad faith in becoming the prosecutor in the steps that followed, is untenable. Their *motives* in seeking to gain that result were improper, and therefore the fact of advising with counsel is no defense. *Grumley* v. *Hotel Co.*,

38 La. Ann. 974; *Lytton* v. *Baird*, 95 Ind. 349. Ritch gave Merritt *carte blanche* to do whatever he thought proper to do. This is sufficient to render Ritch liable for the acts thereafter performed by Merritt, or under his direction. The "family agreement," if not obtained by duress of imprisonment, was certainly secured through an abuse of legal process, and ought not, therefore, to operate as a legal bar. *Sharon* v. *Gager*, 46 Conn. 189. The real question is, did Mr. Porter act as a free and voluntary agent in divesting himself of his property, in order to secure his liberation. *Walbridge* v. *Arnold*, 21 Conn. 430; *Mills* v. *Swords' Lumber Co.*, 63 id. 105. The authorities clearly recognize a species of *moral duress*. *Bryant* v. *Peck Co.*, 154 Mass. 450; *Schoner* v. *Lissauer*, 107 N. Y. 115; *Baker* v. *Morton*, 12 Wall. 150; *Phelps* v. *Zuschlag*, 34 Tex. 373; 1 Sto. Eq. Juris. §§ 239–253; 2 Pom. Eq. Juris. § 942; *Somerson* v. *Somerson*, 44 N. J. Eq. 93. It is, therefore, idle to argue that this coercion did not constitute duress, simply because Mr. Porter's counsel advised and urged submission. *Cummings* v. *Ince*, 11 Adol. & E. 11. The agreement, if valid, does not purport to release the causes of action *now* pending. There is nothing in the subject-matter of the agreement, or in the facts disclosed on the record, which warrants the suspicion that either party had in mind the claim for damage made in the present suit.

*Goodwin Stoddard* and *Samuel Fessenden*, for the appellees (defendants).

Chapter 162 of the Public Acts of 1889, under which the plaintiff was temporarily restrained, is constitutional and valid. There is a clear, broad, substantial difference between the authorities cited by the plaintiff and the case at bar, in this regard: that by the issuance of the preliminary order in question there has been no *final adjudication* of the rights of liberty and property of the plaintiff. The authorities cited were cases in which the judgments were *final*. But the preliminary order in this case was only such a temporary and provisional action as comported with the necessities,

emergencies and exigencies of the situation. This law was passed in the interest of humanity, for the protection of life, and in view of that purpose should be construed by this court. *Doyle, Petitioner*, 16 R. I. 537 ; *Wellman, Petitioner*, 3 Kan. 100. The distinctions made in these cases clearly apply to the case at bar. The order of custody was not invalid because the proceeding was not legally pending when it was issued. The plaintiff cites authorities holding that civil actions in Connecticut are not deemed to have been commenced until service of the writ upon the defendant. These cases are only applicable to civil actions. This is not a suit ; it is a proceeding under a special statute. But if the cases cited were to govern, we are clearly brought within them. A formal petition or application to the court where the court makes an order thereon, stands upon entirely different footing. By making an application take the place of a complaint, the legislature did away with a notice prior to the return. Hence pendency by force of statute dates from the application. *Wentworth* v. *Farmington*, 48 N. H. 207. There is a clear distinction between a suit and a proceeding. 19 Amer. & Eng. Ency. of Law, 220 *et seq. ; Beresteel* v. *Orvis*, 31 Wis. 117 ; *Gordon* v. *Tyler*, 53 Mich. 629. The defendants. Merritt and Ritch are not liable, even if the order is invalid. The question of their liability has been finally settled by the trial court's decision of questions of fact. The appointees of the court are not in law the agents of the applicant. Their sole authority comes from the Court of Probate. If the Court of Probate had no jurisdiction to make the orders, the court's appointees are not for that reason the agents of the applicant. The custodians of the plaintiff did not act in excess of the authority of the order. The finding settles this as a matter of fact. The question of conspiracy involved in this case was disposed of by the court as a question of fact. The question whether the " family agreement " was obtained by duress, was a question of fact. *Feller* v. *Green*, 26 Mich. 70 ; *Walbridge* v. *Arnold*, 21 Conn. 431 ; *McVane* v. *Williams*, 50 id. 530. The conclusion of coercion is not always a necessary one from the fact of unlawful restraint,

Porter *v.* Ritch et al.

and it must appear that the action of the party has been influenced by it. 6 Wait's Act. & Def. 650; *Feller* v. *Green*, *supra; Green* v. *Scranege*, 19 Iowa, 461; *Alexander* v. *Pierce*, 10 N. H. 498. The family agreement was not absolutely void because of the infancy of one of the sons. Tay. on Inf. & Cov. § 14; *Gregory* v. *Lee*, 64 Conn. 407; Note in 18 Amer. St. Rep. 573; *Beardsley* v. *Hotchkiss*, 96 N. Y. 211. The trial court was correct in holding that the family agreement bound the plaintiff and embraces the matters which were the cause of action in the present suit. Such agreements and settlements the courts are inclined to uphold. 2 Beach Eq. § 1003; *Stapilton* v. *Stapilton*, 1 Ark. 2; *Williams* v. *Williams*, L. R. 2 Ch. App. 294; 2 Pom. Eq. Juris. § 805; *Leach* v. *Forbes*, 11 Gray, 586. If the court has properly interpreted the family agreement, there can be no question that the plaintiff is by it debarred from maintaining his present suit. It was the *duty* of the court to find the intent of the parties. *Sherwood* v. *Whiting*, 54 Conn. 333; *Brown* v. *Slater*, 16 id. 195; *Cake* v. *Peet*, 49 id. 504; *Mobile* v. *Jurey*, 111 U. S. 592; *Barreda* v. *Silsher*, 21 How. 146, 161; *Nash* v. *Towne*, 5 Wall. 687; *Canal Co.* v. *Hill*, 15 id. 94.

ANDREWS, C. J. There is quite a long list of reasons of appeal, but it will not be necessary to consider them in detail. They are only an expansion of the claims made by the plaintiff at the trial, and these may all be disposed of by considering a few general propositions.

If the Act of 1889 was constitutional, especially that part of it which is relied on to support the order made by the judge of probate in Stamford on the 18th day of December, 1893, and if the law is so that the proceeding was pending, at the time that order was made, and the order was not void on its face, and if there was no error in the rulings on the evidence, or if the causes of action were discharged by the "family agreement," then there is no material error on which the appellant is entitled to have a new trial. Everything else is included in the finding of facts.

At its January session, 1889, the legislature passed "An

Act concerning Insane Persons "(Public Acts of 1889, p. 88), which enacted that "any judge of a probate court, within his probate district, shall have power to commit any insane person, residing in said district to an asylum in this State, in the manner hereinafter provided;" and that " except when otherwise specially provided by law, no person shall be committed or admitted to an asylum without an order signed by a judge of probate, as hereinafter provided." The Act then proceeded to details, and enacted that " whenever any person in this State shall be insane, or shall be supposed to be insane, any person may make complaint in writing to any judge of probate, within whose district the person complained of shall reside, alleging that such person is insane and is a fit subject to be confined in an asylum, and when any insane person, who ought to be confined, shall go at large in any town, any person may, and the selectmen thereof shall, make a like complaint to the judge of probate, within whose district such town is included. After receiving said complaint, the judge of probate to whom it is made shall forthwith appoint a time, not later than ten days after the receipt of said complaint, and a place within said district, for a hearing upon said complaint, and shall cause reasonable notice thereof to be given," etc. The Act also specifies many other details to be observed by the judge of probate in respect to such hearing: for adjournments, for the certificate of physicians, and what shall be done in case the person complained of is found to be insane ; and in its sixth section says : " Pending the proceedings for a hearing and examination, said judge may make and enforce such reasonable orders for the care and custody of the person complained of, as said judge shall deem suitable and proper."

The complaint made to the judge of probate for the district of Stamford concerning the plaintiff, was made under this legislation and the proceedings were pursuant to its provisions. There is a general claim by the plaintiff's counsel that the whole Act is unconstitutional. It is, however, so obviously within the power of the legislature to make provisions for insane persons, and for their commitment to and

confinement in an asylum for treatment and care, that we
suppose counsel intend to attack this Act only so far as the
provision respecting the care and custody of the person com-
plained of, pending the proceedings, is an essential feature
of it.   It is strenuously insisted that so much of the Act as
is relied on to justify the order given to Bolster and Schock,
is unconstitutional, for the reason that it may, as in this case
it is claimed that it did, deprive a person of his liberty with-
out due course of law.   That constitutional provision is in-
voked, which says that no person shall be deprived of his
life, his liberty or his property, without due course of law.
Nothing can well be dearer to the law than the right of each
person to his life, his liberty and his property.   For more
than six hundred years the law has been zealous and astute
to protect these rights.   The words of Magna Charta, which
declare that every person shall be protected in the enjoyment
of his life, his liberty and his property, except as they might
be declared to be forfeited by the judgment of his peers or
the law of the land, furnish the rule.   In some form of words
this principle is now found in every one of the American
constitutions.   No one does or can deny its binding force.
But constitutional provisions, however often repeated, do not
give to any one an absolute estate in even these high privi-
leges, which he can enjoy to the exclusion of others.   These
privileges must be enjoyed with just limitations,—with such
limitations as are necessary to make their enjoyment by each
consistent with the like enjoyment by all.   The right of all
is superior to the right of any one.   These limitations are
not deprivations of the right.   They are regulations ; so that
no one person can insist on a right to the enjoyment of any
one of these privileges, to the exclusion or the infringement
of the right of any other person to the like enjoyment.   The
taking of life itself by a private person and without warrant
may sometimes be justified.   One may lawfully kill an as-
sailant if necessary to save his own life or the life of his
wife or children.   *Morris* v. *Platt*, 32 Conn. 75.   A burglar
who in the night season is attempting to break into a dwell-
ing, may be killed if his attempt can be frustrated in no

other way.    A husband or father who finds one attempting
to commit rape on his wife or daughter may lawfully kill
him to prevent the crime.    4 Bla. Comm. 179, 180.    Ex-
amples of this sort of regulation are more often found in
the laws and ordinances which apply to property, than else-
where.    Among them are the very many statutes and regu-
lations which concern the use of property.    The constitu-
tional provision just stated has never been regarded as in-
compatible with the principle, equally vital—being essential
to the permanent safety of society—that all property is held
subject to the power of the State to regulate the use by the
owner, when that use is found to be injurious to the com-
munity.    *Mugler* v. *Kansas*, 123 U. S. 623, 665; *Beer Com-
pany* v. *Massachusetts*, 97 id. 25, 32; *Commonwealth* v. *Alger*,
7 Cush. 53.    There are many cases in which the rights to
the use of property must be exercised subservient to the
public welfare.    The maxim of the law is that a private mis-
chief is to be endured rather than a public inconvenience.
On this ground rest the rights of public necessity.    Thus, if
a common highway be out of repair, a passenger may lawfully
go through an adjoining private enclosure.    So it is lawful
to raze houses to the ground to prevent the spreading of a
conflagration, without being responsible in trespass or other-
wise.    *Russell* v. *Mayor*, 2 Denio, 461.    There are many
other like conditions.    See 12 Coke, 13, 63; *Maleverer* v.
*Spinke*, 1 Dyer, 36 *b ;* Vin. Abr., Title "Necessity"; 2 Kent's
Comm. 338; *Governor* v. *Meredith*, 4 Term Rep. 794, 797;
*Respublica* v. *Sparhawk*, 1 Dal. 357, 363; *Vanderbilt* v. *Adams*,
7 Cowen, 349; Cooley on Const. Lim. 739.    So, too, public
nuisances may be abated by anyone who is injured thereby.
*Van Wormer* v. *Mayor*, 15 Wend. 262; Wood, Nuis. 768.
To the same rule the vindication of our law that the prop-.
erty of a defendant in a civil suit may be attached on *mesne*
process and held till final judgment, must be referred.    The
various rules and statutes authorizing these limitations to
the rights of property owners have always been regarded as
police regulations, although they curtail the owner's use in
some degree, and not unconstitutionally.

The right to personal liberty ought, perhaps, to be regarded as on a higher plane than the right of property; but the constitutional protection to the one is precisely the same as to the other. The right to enjoy liberty is always limited by the duty which requires every one to use his liberty in such a way as not to be detrimental to the public. There are many cases in which a man may be restrained of his liberty by any one, and without warrant. "It is justifiable if a man hold another to restrain him from mischief." Com. Dig., "Battery" A. In *Glever* v. *Hynde*, 1 Mod. Rep. 168, a private person without a warrant removed one who was disturbing a funeral service. His action was justified. In *Hall* v. *Flanner*, 1 Levinz, 196, the church warden removed the hat from the head of one who refused to uncover his head during divine service in a church on a Sunday. This was held to be justifiable. In *Handcock* v. *Baker*, 2 B. & P. 260, the defendant broke and entered into the house of the plaintiff to prevent him from murdering his wife. This was justified. A person dwelling in a house infected by any contagious disease may be required by a constable to keep within his house. And if he disregard such command it may be enforced by a watchman; and if any hurt ensue by such enforcement the watchmen are thereby indemnified. 4 Bla. Comm. 161. The health officer of a city may confine one who has been exposed to the small pox, to prevent the spread of that disease. *Harrison* v. *Mayor*, 1 Gill, 264. "A private person may, without an express warrant, confine a person disordered in his mind, who seems disposed to do mischief to himself, or any other person." Bac. Abr., "Trespass" D, *573. "It is universally conceded that every man may for his own protection restrain the violence of a lunatic; and any person may, at least temporarily, place any lunatic under personal restraint whose going at large is dangerous to himself, or others." Tiedeman on Police Powers, 108. Clearly this may be done as preliminary to the institution of judicial proceedings by which a judgment for a permanent confinement may be obtained. 6 South. L. Rev. N. S. 568; 3 Amer. Law Rev. 193; *Colby* v. *Jackson*, 12 N. H. 526;

*Davis* v. *Merrill*, 47 id. 208; *Keleher* v. *Putnam*, 60 id. 30; *Williams* v. *Williams*, 4 Thomp. & C. (N. Y.) 251; *Look* v. *Dean*, 108 Mass. 116, 120; *Doyle, Petitioner*, 16 R. I. 537, 538; Law. Ri. & Rem., § 1066; 11 Amer. & Eng. Ency. of Law, 112; Cooley on Torts, 179; *Commonwealth ex rel. Draper* v. *Kirkbride*, 3 Brew. (Pa.) 393; *Van Deusen* v. *Newcomer*, 40 Mich. 90.

"The right to restrain an insane person of his liberty, is found in that great law of humanity, which makes it necessary to confine those whose going at large would be dangerous to themselves or others. In the delirium of fever, or in the case of a person seized with a fit, unless this was the law, no one could be restrained against his will. And the necessity which creates the law, creates the limitation of the law. In the case of an application to have a guardian appointed over the person and estate of an insane person, under the statute, some time must necessarily elapse before the appointment can be made, and during that time restraint may be necessary. If there is no right to exercise that restraint for a fortnight, there is no right to exercise it for an hour. And if a man may be restrained, in his own home, he may be restrained in a suitable asylum, under the same limitations and rules. Private institutions for the insane have been in use, and sanctioned by the courts; not established by any positive law, but by the great law of necessity and humanity. Their existence was known and acknowledged at the time the Constitution was adopted. The provisions of the Constitution in relation to this subject must be taken with such limitations, and must bear such construction, as arise out of the circumstances of the case." CHIEF JUSTICE SHAW, in the case of *In re Josiah Oakes*, 8 Law Reporter, 122, 124.

Limitations to the use of property, or to the personal liberty of another, in the different classes of cases to which the instances we have cited may be referred, have always been holden not to infringe the constitutional provision now invoked. In none of them is there any deprivation of the right, but only its just regulation. These limitations serve to pre-

vent such a use by one of his property, or of his liberty, as takes-away from others their equal right to the use of their own.  One who is prevented from injuring another cannot justly assert that he has himself been deprived of any right. An insane person whose going at large is dangerous to others, or to himself, and who is restrained, cannot maintain that he has been deprived of any right, or that he has suffered any injury.  In most of the cases cited, the act placing a restriction upon the liberty of another was by a private person, and the act was held to be justified.  But a private person can act only in an emergency, and then only at his peril: the peril of being unable to prove the existence of the emergency which is his justification.  Restrictive conditions of this kind upon personal liberty, or upon the use of property, are sometimes absolutely necessary to the safety of all.  A wise administration of government does not leave it to private persons to decide when these restrictions shall be exercised.  Private persons may not be willing to take the hazard.  And so statutes are passed which directly name or authorize a municipal board to appoint some one to judge of the emergency and direct the performance of those acts which any individual might do at his peril without any statute.  Such an one is the agent of the law and incurs no personal liability. Statutes of this kind exist in many States and have been upheld, so far as we know, without exception.  *Raymond* v. *Fish*, 51 Conn. 80 ; *Dunham* v. *New Britain*, 55 id. 378 ; *Russell* v. *Mayor*, 2 Denio, 461 ; *Van Wormer* v. *Mayor*, 15 Wend. 262 ; *Coe* v. *Schultz*, 47 Barb. 64 ; *Taunton* v. *Taylor*, 116 Mass. 254 ; *Train* v. *Boston Disinfecting Co.*, 144 id. 523 ; *Ex parte Shrader*, 33 Cal. 279 ; *Harrison* v. *Mayor*, 1 Gill, 264 ; Cooley, Const. Lim. 720, 721.

That part of the sixth section of the Act of 1889 under which the judge of probate acted, is a statute of this kind. It named the judge of probate in each district as the agent of the law, to decide whether such conditions existed as made it necessary to confine a person supposed to be insane, for a temporary period.  It does not violate any constitu-

tional provision. It is clearly within the police power of the State.

The statute authorizes the judge to make reasonable orders for the custody of the person complained of, "pending the proceedings for a hearing and examination." If we should assume that this language did not authorize the order made on the 18th of December, upon the mere presentation of the complaint, it clearly did authorize the order as modified and confirmed on the 22d of that month, after a full hearing of all parties; the action of the judge upon the hearing was, at least, equivalent, so far as concerns the defendants Bolster and Schock, to the order of that day. We might, therefore, deem it immaterial to pass upon the validity of the order when first issued; not because it could only affect the claim for damages for the unlawful custody from the 18th to the 21st, but because the statute under which it arises has since been altered, and the claim for damages, if valid, has been discharged by the family agreement.

It is further claimed that the order to Bolster and Schock was void, for the reason that no proceeding for a hearing was pending at the time it was made. The "proceeding" was the application to the Court of Probate to have Mr. Porter declared insane and a fit person to be confined in some suitable asylum. This application was made to the court on the 18th day of December, 1893. With this application there was also presented to the court the affidavit of Dr. Geib, that in his opinion Mr. Porter was insane and liable at any time to do injury to himself or others. The Court of Probate thereupon made an order fixing the time for a hearing on the application, together with an order of notice to be given to Mr. Porter; and immediately thereafter, and before the same was served on Mr. Porter, issued the said order to Bolster and Schock. It appears that Bolster and Schock did not attempt to enter upon their duties under the said order to them, until after service of the said application and order of notice had been made on Mr. Porter; so that the "proceeding for a hearing" was pending at all times while they were exercising any care or control

of the plaintiff. But the argument is that the said order for care and control was void, for the reason that the proceeding was not pending at the moment that order was made; service on Mr. Porter not then having been made. The argument depends on the case of *Jencks* v. *Phelps*, 4 Conn. 149; and the several cases in later reports which follow that one. It was held in that case that an "action" was not commenced till service had been made on the defendant. It was said by CHIEF JUSTICE MARSHALL in *Cohens* v. *Virginia*, 6 Wheat. 264, 407, that an action or suit is the prosecution of some demand in a court of justice. An "action," then, requires two parties: one who prosecutes the demand, and the other against whom the demand is prosecuted, and something sought to be obtained by the former of the latter. In this sense it is no more than just that an action shall not be deemed to be commenced so as to affect the defendant, until service has been made upon him. This is what was done in *Jencks* v. *Phelps*. It seems to us that the proceeding before the Court of Probate in the district of Stamford on the 18th day of December, 1893, was not an action in the sense in which that word was there used, and that the rule of *Jencks* v. *Phelps* does not apply. There were no parties; there was no demand; nothing sought to be recovered by one against another. It is obvious that the definition of an action given by CHIEF JUSTICE MARSHALL does not include, and was not intended to include, proceedings or actions *in rem*, nor proceedings in the nature of an inquest of office, and other like proceedings. By the said Act of 1889 the judge of probate was made an agent of the law to decide whether or not a person complained of was insane and ought to be committed to an asylum. The judge was to act on the complaint in writing of any person; but the person complaining did not thereby become a party to the proceeding. The statute requires the judge of probate to give notice of the time and place of hearing to the person complaining, as much as it does to the party complained of. At no time in the progress of the inquiry is there an "action" pending in the court, nor are there any "parties," in the sense that these words are

used in the case of *Jencks* v. *Phelps*.   The proceeding was
the inquiry by the court as to the sanity or insanity of the
person complained of.   It was an inquest of insanity.   It
was in the nature of a police regulation for the care and re-
straint of a person insane, or supposed to be insane.   The
proceeding was commenced when the court received the
written complaint.   So far as the Court of Probate was con-
cerned, the proceeding was then pending.   Any proceeding
once commenced in any court in the regular way is pending
in the court until it is in some way terminated.   Webster's
Dict.   Until it is terminated, the proceeding is in suspense,
it is depending.   *Wentworth* v. *Farmington*, 48 N. H. 207 ;
*Littlefield* v. *Delaware & H. C. Co.*, 3 Cliff. 371.   Our own
case of *Huntington* v. *McMahon*, 48 Conn. 174, shows clearly
what the term " pending " means when applied to a court.
Complaint had been made to a justice of the peace in the town
of Winchester, for the condemnation of certain liquors.   The
liquors had been seized, notice was given, and a hearing was
had before the justice, at which certain parties appeared who
claimed to be the owners of the liquors.   The justice con-
demned the liquors to be destroyed.   The owners took an
appeal to the District Court, and the liquors were committed
to the keeping of a person named by the justice.   The next
day, or within a day or two, the owners brought replevin for
the liquors and took them out of the possession of the person
so named as the keeper.   The case cited was an application
to the said District Court by the State's Attorney, that all
the persons concerned in the action for replevin be punished
for contempt of that court.   On the hearing of the contempt
proceedings, one claim made by the parties was that there
could be no contempt of the District Court, for the reason
that the appeal was not pending in that court at the time the
replevin was served.   This court held that the appeal was
pending in the District Court as soon as the appeal was regu-
larly taken from and allowed by the justice court, although
it was long before the return day to the District Court, and
although it appeared that the appeal papers had not been
filed with the clerk of that court, and that they had not even

been made out by the justice; and that the bringing and serving of replevin was a contempt of the District Court. We are of the opinion that the proceeding for a hearing was pending at the time the order to Bolster and Schock was issued.

The plaintiff argues that the order given by the judge of probate to Bolster and Schock was void on its face, and cites largely from authorities to sustain his claims. We are not able to agree with the plaintiff. It seems to us that he misjudges the character of that order. It is not a judgment. It is a temporary order, provisional, issued only as a precaution to provide against an emergency deemed liable to arise; an order in its nature interlocutory, rather than final. It is a part of the procedure and does not enter into the judgment or decree. It is not an adjudication. It is true that this order does not recite the affidavit of Dr. Geib, nor does it recite the fact that proceedings for a hearing as to the sanity of Mr. Porter were then pending. But the Superior Court could not shut from its eyes, nor can this court, the fact, which the record of the Probate Court discloses, that that court had that affidavit before it at the time this order was issued, and acted on it; nor that the proceedings for the hearing were at that time actually pending. To be sure, the order committed the plaintiff to the care and custody of the persons named. But it was not an order of commitment in execution, and therefore was not to be construed with the same strictness as are final orders. *The King* v. *Gourlay*, 7 Barn. & Cress. 669. It was not void. In the case of *Van Wormer* v. *Mayor*, 15 Wend. 262, an order was made by the board of health of the city of Albany declaring certain premises to be a nuisance and ordering the same to be abated, because of the Asiatic cholera then prevailing in the city; and thereupon the mayor pulled the house down. The order was sustained, although it did not appear that it had ever been reduced to writing, or recorded, except by way of recital in an ordinance by the board.

During the trial the plaintiff offered evidence of certain acts done by one Thoms, on the ground that Thoms had

been deputed by Bolster to do those acts. The defendant objected to this evidence, for the reason that the complaint did not charge the defendants with doing anything by their agent. The court sustained the objection. This ruling was in accordance with the rules established under the Practice Act. Practice Book, p. 14, Rule III, § 1.

The Rev. Mr. Scoville testified that the plaintiff, within a year next before he was placed in custody, read a paper on John Calvin before a literary club in the city of Stamford, and that the paper " was considered by the members of the club as one of the strongest papers they had had." The defendants asked that this evidence be stricken out; and the court so ordered. We think the evidence was rightly stricken out. It was hearsay.

Mr. Merritt testified concerning his action in making the complaint to the Court of Probate, and in reply to a question by Mr. Fessenden, who was his counsel in this action, said: " I laid the facts before you, as my counsel, and before Dr. Geib, at your suggestion, as a competent medical man, and as the family physician. Since that time I have done absolutely nothing except as you directed me. I have been a mere instrument since that. In fact, I was a mere instrument before." Mr. Fessenden then asked this question: " Did you, in any way, directly or indirectly, instruct me as to the course of procedure, or any step I have taken in it, or as to any advice of counsel I have given in the matter?" The plaintiff objected to this question, but the court admitted it, and the witness answered: " I never did." This evidence was admissible. As Mr. Merritt was charged with acting maliciously in making this complaint to the Court of Probate, he had the right to show that he acted on the advice of counsel.

Counsel for the plaintiff asked of an expert witness, one Dr. Cowles, a hypothetical question. It was conceded, and the fact was so, that it involved assumptions concerning which no evidence whatever had been offered. The court excluded the question, for the reason that a foundation for it had not been laid; and, upon the offer of counsel to sub-

sequently present such evidence, decided not to admit the question until the basis for it had been laid. This ruling was no more than an exercise by the court of its discretion as to the order in which evidence should be put in. It is not a ground of error.

One part of the defendants' answer is a discharge of all the causes of action alleged in the complaint, by the agreement of the parties. This defense sets up the agreement called the "family agreement." After stating the purpose for which that agreement was entered into, its execution and delivery, and setting it forth in full as a part of the defense, by making it an exhibit, and alleging that the defendants had fully kept and performed all their part of said agreement, this defense concludes in this way: "And the defendants say, upon the facts aforesaid, that by said agreements and the proceedings thereunder, and by the performance by the defendants of the provisions and conditions thereof on their part to be performed, and by said acts of the defendants, the subject-matter of the present suit, and the plaintiff's claims or alleged rights of action described in plaintiff's complaint, and all of the controversies, questions and claims between the plaintiff and the defendants, were fully and finally adjusted, settled, satisfied and ended."

The plaintiff in his reply admits the execution and delivery of the said agreement, and substantially admits the performance by the defendants of their part thereof; but asserts that "the execution of the said paper, by the plaintiff, was procured, induced and compelled under the circumstances, and by the false imprisonment and duress (set forth in the various paragraphs of the complaint), and by the conspiracy, malicious arrest, fraud and duress" therein stated. To this replication the defendants rejoined by a denial.

The issue so formed, as were all the other issues in the case, was found in favor of the defendants. The finding of facts on this part of the case is as explicit and clear as language can make it. The court says: "It was understood, intended and agreed by all the parties to said negotiation and settlement, and to the said family agreement, that the same should accomplish a full and final settlement and ad-

justment of all the existing claims, questions and differences between the parties thereto, and of all the legal proceedings then pending, and the subject-matter thereof, and of all the matters arising out of the proceedings instituted by Mr. Merritt—the said complaint and application made to the judge of probate on the 18th day of December, 1893,—in favor of, or against, whatever party, and including all the matters covered by the plantiff's complaint, all of which antedated the said settlement."

We are not able to see why this finding of the issue and of the facts is not a complete and absolute bar to the plaintiff's entire action. Had he desired to make the claim that the "family agreement" did not of itself operate to bar his action, because its terms do not warrant such a construction, and that the alleged intention that it should so operate was unavailing because not so expressed in it, he should have demurred.

So far as the plea of duress is concerned the plaintiff was never in such a situation that it was legally impossible for him to make an agreement which would be binding on him. All those circumstances with which he was surrounded, so graphically and impressively set forth by his counsel in their brief—which constitute the duress and imprisonment complained of, and which would be likely to affect his freedom of action—were for the consideration of the trial court. From the finding of facts we know that the trial court did consider them, and having so considered them has found that " said family agreement was executed by the plaintiff freely and voluntarily, and under the advice of his friends and counsel, and without any influence having been brought to bear upon him by any person or persons save only his friends and counsel, who, acting solely in his interests, advised and urged him to its execution."

It seems to us that the plaintiff is bound by the family agreement; that he ought to keep it, and that he has no right of action for anything alleged in the present complaint.

There is no error.

In this opinion the other judges concurred.